**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE SCALE EFFECT COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 19-cv-1599** |
| | ) | |
| **BARON CHOCOLATIER, INC.,** | ) | **Judge Jeffrey I. Cummings** |
| **TOMASZ KOTAS,** | ) | |
| **VERONI BRANDS CORP., and** | ) | |
| **IGOR GABAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, The Scale Effect Company ("Scale"), brings this suit against defendant Baron Chocolatier, Inc. ("Baron"), arising out of Baron's failure to pay forty-two invoices for Scale's services. Scale alleges breach of contract, or in the alternative, quantum meruit, against Baron. Although this case is centered around Baron's failure to honor its obligations, Scale also brings claims against Veroni Brands Corp. ("Veroni"), Tomasz Kotas ("Kotas"), and Igor Gabal ("Gabal"), alleging a "scheme to defraud" based on Baron's repeated, but ultimately unfulfilled, promises that Baron would pay its debts to Scale. Scale further brings a claim for successor liability against Veroni and seeks to pierce the corporate veil with respect to Kotas, Gabal, and Veroni.

Defendants Veroni and Gabal (hereinafter, "defendants") move for summary judgment on Scale's successor liability, scheme to defraud, and veil piercing claims asserted against them. As set forth below, Scale seeks to proceed on its claims against defendants by invoking certain exceptions to the general rules governing successor liability, promissory fraud, and veil piercing.

Illinois law mindfully makes it difficult for plaintiffs, like Scale, to prove these exceptions to the general rules because they cut against established principles of contract, corporate, and promissory fraud law. Scale fails to meet its burden. Thus, for the reasons set forth below, defendants' motion, (Dckt. #133), is granted.

## I.      LEGAL STANDARD

### A.  Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. To determine whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Summary

judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

### B. Requirements of Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). In turn, Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Here, defendants filed a Local Rule 56.1 statement of material facts with their motion for summary judgment, which included proper citations to the evidentiary material supporting each fact. However, Scale did not properly respond to defendants' statement of material facts because

it denied certain factual assertions without citing any evidence to support its denial or cited to paragraphs of its statement of additional facts without citing to the underlying evidence which purportedly supported its denial. (*See* Dckt. #139 ¶¶14–24, 39, 41–47). For these reasons, the Court in its discretion deems defendants' statement of material facts admitted to the extent that the facts asserted therein are supported by the evidence in the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.").

## II.     FACTUAL RECORD

The Court draws the factual record from: Defendants Veroni and Gabal's Statement of Material Facts Pursuant to Local Rule 56.1 ("DSOF"), (Dckt. #133-1), and its accompanying exhibit, (Dckt. #134); Plaintiff's Response to DSOF ("DSOF Resp."), (Dckt. #139); Plaintiff's Statement of Additional Facts ("PSOF"), (Dckt. #138), and its accompanying exhibits, (Dckt. ##138-1 to 138-9); and Defendants Veroni and Gabal's Response to PSOF ("PSOF Resp."), (Dckt. #146-1). As required, the Court views the facts in the light most favorable to Scale (the non-movant).

### A.  The Scale Effect Company

Scale is a Pennsylvania limited liability company that is in the business of shipping and forwarding freight to customers in the United States and abroad. (DSOF Resp. ¶¶1, 3).

### B.  Baron Chocolatier, Inc.

Baron is an Illinois corporation that was in the business of importing premium chocolate and confections from Eastern Europe and distributing and selling them to large retailers

throughout Canada and the United States. (DSOF Resp. ¶¶4–5, 10–11). To operate its business, Baron required the services of transportation companies and freight forwarders to import the products and transport them to Baron and its customers. (*Id.* ¶11). Kotas was at all relevant times the sole shareholder of Baron and the sole director sitting on Baron's board of directors, and he served as Baron's President and Chief Executive Officer. (PSOF Resp. ¶23). Baron had two other employees in addition to Kotas: Gabal (who served as Baron's Executive Vice President) and non-defendant Mary Appelhans ("Appelhans"). (*Id.* ¶28).

Baron received shipments of chocolate from a Polish supplier (Millano) through December 6, 2018. (*Id.* ¶35). Baron thereafter ceased importing chocolate confections. (*Id.*). On or about October 1, 2019, Baron filed a voluntary petition for bankruptcy. (*Id.* ¶40).

### C. The business relationship between Scale and Baron.

In September 2017, Scale entered into a verbal agreement with Baron, whereby Scale agreed to ship imported chocolate and confections to Baron's place of business in Vernon Hills, Illinois. (DSOF ¶14; PSOF ¶1). In particular, Scale and Baron agreed on the material terms of an oral freight forwarding contract, including shipping rates, volume, and routes. (DSOF ¶14). Between September 5, 2017, and August 10, 2018, Scale completed approximately seventy shipments for Baron. (*Id.* ¶21). Scale invoiced Baron after each shipment and required payment within sixty days of each invoice. (PSOF ¶2).

As of July 2018, Baron had failed to pay for thirty-seven past due invoices dating as far back as March 2018. (*Id.* ¶8). On or around July 13, 2018, Kotas and Gabal, on behalf of Baron, met with Scale to discuss a payment plan. (*Id.*). At that meeting, Baron agreed to pay six specific past due invoices (the "Six Invoice Agreement"). (*Id.*). Kotas and Gabal represented that Baron would pay these invoices by the end of the following week. (*Id.*; Dckt. #138-1 at 4).

Scale and Baron also discussed repayment terms that would bring Baron's account with Scale current over the next several months.  (Dckt. #138-1 at 4).  Under that payment schedule, Baron was to pay portions of the past due balances owed to Scale in periodic installments by dates certain, with the first payment due on or about August 10, 2018 (the "Payment Agreement").  (PSOF ¶9; Dckt. #138-5).

At or near this time, Baron had other pending shipments in transit for one of their customers, Costco.  (Dckt. #138-1 at 5).  In order to complete this shipment without added delay, on July 30, 2018, Baron arranged to pay one invoice to ensure that the shipment was completed.  (*Id.*; PSOF Resp. ¶10).  The following day, on July 31, 2018, Baron made payments totaling over $40,000 on four invoices, including one invoice that was part of the Six Invoice Agreement.  (Dckt. #128-1 at 6–7).

Two days later, on August 2, 2018, Scale followed up and stated, "I expect you to stick to the agreements we have made."  (Dckt. #138-4 at 25).  Gabal, on behalf of Baron, responded the same day and stated, "As you see we are paying you and will continue to pay you.  We need to collect [accounts receivable] from our customers . . ."  (*Id.* at 24).  On or about August 6, 2018, Scale reached out to Baron again and explained that in order to have additional containers released (in connection with a second Costco-related shipment), Baron needed to pay for that Costco shipment as well as tender payment for the past due invoices that were previously promised in July.  (Dckt. #138-1 at 6; PSOF Resp. ¶14).  Baron paid $11,780.58 for the second Costco shipment on or about August 8, 2018.  (PSOF Resp. ¶14).

6

The last shipment Scale sent was dated August 9, 2018, with payment due the same day. (Dckt. #138-1 at 49).[1] After August 8, 2018, Baron did not make any further payments, including any payments pursuant to the Payment Agreement, which were scheduled to begin on August 10, 2018. Ultimately, Scale has identified forty-two shipments and their corresponding invoices that Baron failed to pay. (PSOF Resp. ¶4).

Although Scale ceased shipping product to Baron, the parties continued to discuss the Six Invoice Agreement and Payment Agreement for the next few months. On or about August 24, 2018, Scale spoke with Gabal by phone about having a payment made via credit card; however, no such payment was ever made. (*Id.* ¶16). On or about September 7, 2018, Scale again spoke with Gabal who stated that Appelhans would arrange for a payment to be made in connection with several past due invoices. (*Id.* ¶17). On or about September 11, 2018, Scale followed up with Gabal via email based on this representation. (*Id.*). Again, Baron failed to make any payment as promised. (*Id.*).

Ultimately, Gabal responded on October 7, 2018, and stated: "as I told you many time [sic] that as soon as our Cash situation improves we will pay our invoices. . . as soon as we get Cash into the Company we will pay You . . ." (*Id.*). Another month without payment passed and Scale reached out again to Baron. (*Id.* ¶18). Gabal reiterated on November 8, 2018, "We told you many times and telling [sic] you again that the Company working [sic] very hard across the board to pay your invoices as soon as the liquidity will be improved." (*Id.*). Once more, the invoices were not paid.

---

[1] As previously explained, Scale invoiced Baron after each shipment and required payment within sixty days of each invoice. (PSOF Resp. ¶2). Thus, the Court relies on the invoice date to determine the shipment date, not the due date of the invoice. The record contains invoices with *due* dates that post-date August 9, 2018 (*see e.g.*, Dckt. #138-1 at 52 (Invoice 6320) due September 14, 2018). However, the *invoice* date associated with this invoice is July 16, 2018.

**D. Baron's financial transactions in the fall of 2018.**

Baron's bank statements reflect that that in October and November 2018, Baron received gross deposits of over $300,000 per month to its account yet ended those months with a balance of approximately $54,000 and $30,000, respectively. (PSOF Resp. ¶18; Dckt #138-7). Moreover, in the fall of 2018, Kotas received wire transfers from Baron totaling $28,200 in September 2018; $7,550 in November 2018; and $19,050 in December 2018, while Gabal received wire transfers totaling $15,500 in September 2018 and $16,000 in December 2018. (PSOF Resp. ¶20).

**E. Veroni Brand Corporation**

Veroni is a Delaware corporation with its principal place of business located in Lake County, Illinois. (DSOF Resp. ¶6). Veroni is publicly-listed and subject to audits and other public disclosures mandated by the federal securities laws. (*Id.* ¶44). At all relevant times, Veroni maintained all corporate formalities. (*Id.*). Veroni and Baron were separate corporations at all times, and they had no interlocking directorates. (*Id.* ¶41). Moreover, there was no parent, subsidiary, or affiliate relationship between Baron and Veroni. (*Id.*). Veroni was a complete "stranger" to the relationship between Scale and Baron and it had no connection to the business or financial relationship between Scale and Baron. (*Id.* ¶20).

Prior to December 2018, Veroni distributed and sold products including energy drinks. (PSOF Resp. ¶32). Starting in December 2018, Veroni picked up the chocolate confections importing line of business in Baron's stead. (*Id.* ¶35). Specifically, Veroni imported chocolate from Millano (Baron's prior supplier) and sold chocolate inventory to major retailers, some of whom were previously Baron's customers, as well as dollar stores, grocery stores, and convenience stores. (*Id.* ¶¶36–38).

From December 2017 through September 2018, Kotas, and family members including his wife, acquired twelve million shares in Veroni.  (*Id.* ¶24).  In all, both Kotas and Gabal (who served as President of Veroni) collectively owned twenty-four million out of the twenty-seven million outstanding shares of Veroni, roughly forty-seven percent each and ninety-four percent collectively.  (*Id.* ¶¶24–25).  Kotas[2] and Gabal also lent money to Veroni, including $155,000 in October 2018.  (*Id.* ¶22).  In addition, Baron transferred $55,000 to Veroni in January 2018.  (*Id.* ¶20.)

Both Baron and Veroni operated out of the same principal address—650 Forest Edge Dr., Vernon Hills, Illinois—that had a warehouse and office space on the premises.  (*Id.* ¶26).  On or about February 5, 2019, Veroni began leasing new office space; the next day, Baron announced its intention to vacate its lease at 650 Forest Edge Dr. and move out by February 15, 2019.  (*Id.* ¶26).  At this time, Baron also announced layoffs of all its employees (Kotas, Gabal, and Appelhans).  (*Id.*).  By no later than March 2019, Appelhans worked in a near-identical role for Veroni.  (*Id.* ¶29).  That said, Appelhans may have been working with Veroni for a while: in July 2018, she sent an email to Scale via a Veroni Brands email address with a Veroni signature block.  (*Id.* ¶¶29–30).  At one point in 2019, Kotas was also an employee of Veroni.  (*Id.* ¶24).

## III.    ANALYSIS

Defendants seek summary judgment on Scale's successor liability claim against Veroni, and on its scheme to defraud and corporate veil piercing claims against both Veroni and Gabal. For the reasons set forth below, the Court grants summary judgment to defendants on each claim.

---

[2] Kotas moved for summary judgment on Scale's claim to pierce the corporate veil under an alter ego theory.  (Dckt. #127).  On July 10, 2023, Kotas entered bankruptcy, (*see* Dckt #149), and the Court stayed this proceeding as to Kotas until the resolution of his bankruptcy proceeding, (*see* Dckt. #150).  The bankruptcy proceedings against Kotas (and those against Baron) have concluded.

**A. Scale's successor liability claim against Veroni fails for multiple reasons.**

Under Illinois law, "[t]he well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation." *Vernon v. Schuster*, 688 N.E.2d 1172, 1175 (Ill. 1997). "The traditional rule of successor corporate nonliability developed as a response to the need to protect bonafide purchasers from unassumed liability and was designed to maximize the fluidity of corporate assets." *Id.* (cleaned up). "To offset the potentially harsh impact of the rule, however, the law also developed methods to protect the rights of corporate creditors after dissolution." *Id.* (cleaned up). To this end, the general rule of successor nonliability maintains four exceptions where liability can attach: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id.* at 1175–76; *People ex rel. Dep't of Human Rights v. Oakridge Healthcare Ctr.*, 181 N.E.3d 184, 191 (Ill. 2020) (articulating the four exceptions in a case where the predecessor corporation transferred substantially all of its assets to the successor corporation pursuant to an operations transfer agreement).

Scale alleges that Veroni "is a successor corporation and a mere continuation of defendant Baron such that Veroni may be held liable for the debts and liabilities of its predecessor." (Dckt. #12 at 8). Scale also alleges that "Veroni is a mere continuation of Baron" and that "this continuation was for the fraudulent purpose of evading the debts Baron owed to Plaintiff." (Dckt. #140 at 2, 5). Thus, Scale proceeds under the third and fourth exceptions to the general rule of nonliability.

1.    **Scale cannot succeed on its theory that Veroni was a mere continuation of Baron because Veroni did not purchase Baron or receive a transfer of substantially all of its assets.**

Scale attempts to proceed under the third exception to the successor corporation nonliability rule by arguing that Veroni is a mere continuation of Baron. Veroni asserts that Scale cannot invoke this exception because in order to be liable as a "successor" there must be a "purchase" of the corporation. (Dckt. #146 at 6).

Courts routinely address whether to impose successor liability in cases where there is an underlying purchase of one corporation by another. *See e.g.*, *Vernon*, 688 N.E.2d at 1176–77; *Diguilio v. Goss Int'l Corp.*, 906 N.E.2d 1268, 1277 (Ill.App. 2009) (involving an underlying asset purchase agreement); *Thornton v. M7 Aerospace LP*, 903 F.Supp.2d 654, 658, 663–64 (N.D.Ill. 2012) (same). The Illinois Supreme Court has also considered successor liability in a case where a corporation transferred substantially all its assets to another corporation pursuant to an operations transfer agreement and then immediately ceased operations. *See Oakridge Healthcare Ctr., LLC*, 181 N.E.3d at 187, 191, 197–98. Thus, whether through evidence of an asset purchase agreement or the transfer of substantially all assets through an operations transfer agreement, a plaintiff cannot "prove the continuity exception without an exchange of assets between defendant and [the] alleged predecessor corporation." *Lincoln Nat. Life Ins. Co. v. Nicklau, Inc.*, No. 98 C 2453, 2000 WL 251708, at *2 (N.D.Ill. Feb. 24, 2000) (citing *Amann v. Sylvania Aero Enter.*, No. 87 C 10699, 1989 WL 152951, at *4 (N.D.Ill. Nov. 20, 1989)).[3]

Here, Scale has not even alleged—let alone provided evidence—that Veroni "purchased" Baron or that Baron transferred substantially all its assets to Veroni pursuant to a transfer

---

[3] Scale does not address this authority under Illinois law. Instead, it references a federal case that defendants no longer rely upon and that the Court previously distinguished because it concerns the federal successor liability standard. (*See* Dckt. #140 at 7 (citing *Teed v. Thomas & Betts Power, LLC*, 711 F.3d 763 (7th Cir. 2013)).

agreement and immediately ceased operations. To the contrary, as Scale acknowledges, Baron remained in existence and did not file for bankruptcy until October 2019—over ten months after Veroni added its chocolate confections importing line of business. Given this, Scale's theory that Veroni is merely a continuation of Baron fails. *See, e.g., Lincoln Nat.*, 2000 WL 251708, at *2; *Amann*, 1989 WL 152951, at *4.

> **2.  Scale cannot succeed on its theory that Veroni was a mere continuation of Baron because there is no evidence of identity of ownership between Baron and Veroni.**

As the Illinois Supreme Court made clear in *Vernon*, Illinois court have "consistently required identity of ownership before imposing successor liability under [the continuation exception." *Vernon*, 688 N.E.2d at 1176 (cleaned up); *Groves of Palatine Condo. Ass'n v. Walsh Constr. Co.*, 77 N.E.3d 687, 698 (Ill.App. 2017) (same); *Villaverde v. IP Acquisition VIII, LLC*, 39 N.E.3d 144, 154 (Ill.App. 2015) ("Illinois courts have held that the most important factor in determining whether a merger has occurred for purposes of the continuation exception is the identity of the ownership of the new and former corporations."); *Synergy Glob. Outsourcing, LLC v. Sagility Operations Inc.*, No. 21 C 5652, 2024 WL 3757081, at *6 (N.D.Ill. Aug. 9, 2024) ("The continuity exception is premised on continuity of ownership."); *Mamacita, Inc. v. Colborne Acquisition Co., LLC*, No. 10 C 6861, 2011 WL 881654, at *4 (N.D.Ill. Mar. 11, 2011) ("Illinois courts have held that [the mere continuation exception] hinge[s] on a finding of common ownership in the new and former businesses."); *see also Workforce Solutions v. Urban Services of America, Inc.*, 977 N.E.2d 267, 285 (Ill.App. 2012) (noting that the "identity of ownership" requirement is satisfied where the former owners "retain a controlling interest in the successor entity.").

It is undisputed here that Baron's sole shareholder (Kotas) does not own Veroni and, that

he instead holds only a minority share of the Veroni stock. Nonetheless, Scale cites to a federal district court's decision for the proposition that "the overlap of ownership interest" is just one of several factors to be considered in determining whether the continuation exception applies and that it suffices to show that Kotas was "a significant shareholder in both companies." (*See* Dckt. #140 at 6 (citing *Kaeser & Blair v. Willens*, 845 F.Supp. 1228, 1233 (N.D.Ill. 1993)). Scale also points to the fact that Baron and Veroni shared the same principal address, used common warehouse and office space, and had a significant overlap in employees. (Dckt. #140, at 3–4).

However, the test of continuation articulated in *Kaeser* was expressly rejected by the Illinois Supreme Court's majority in *Vernon*, which reversed the appellate court (which had relied on *Kaeser*) because its test of continuation, namely "that common identity of ownership is only one factor out of many, is not the majority view." *Vernon*, 688 N.E.2d at 1176.[4] Consequently, "the continuation exception to the rule of successor corporate nonliability cannot be applied to [a] defendant" where there is a "lack of common identity of ownership." *Id.* at 1177. This is true even if the alleged successor corporation carries on the predecessor corporation's business operation. *Id.* at 1176; *Diguilio*, 906 N.E.2d at 1278 (where there was no identity of ownership, the continuation exception did not apply despite the fact that the purchaser produced the same product lines, continued to do business with the same customers, and kept the same phone numbers as its predecessor). Nor is it material that Baron and Veroni operated out of the same business location or shared management employees. *See Groves of Palatine*, 77 N.E.3d at 700 (where there was no identity of ownership, the fact that the alleged successor shared a common president and "operate[d] out of the same locations" did not transform the successor "into a mere continuation of the corporation.").

---

[4] The dissent in *Vernon*, on the other hand, embraced the *Kaeser* standard. *See Vernon*, 688 N.E.2d at 1178 (citing *Kaeser*, 845 F.Supp. at 1233).

13

As such, Scale's theory that Veroni is merely a continuation of Baron fails for the additional reason that it has failed to show that there is an identity of ownership between Baron and Veroni.

### 3. Scale has produced no evidence that Baron and Veroni entered into a transaction for the fraudulent purpose of avoiding liability for Baron's financial obligations to Scale.

Scale argues in passing that the fact that Baron and Veroni "shared similar controlling shareholders, officers, employees, and office space, while selling the same goods, imported from the same supplier and sold to the same customers" shows that Veroni was continuing Baron's business "for the fraudulent purpose of evading the debts Baron owed to Plaintiff." (Dckt. #140 at 5). However, Scale's attempt to invoke this fourth exception to the successor corporation nonliability rule fails because "[t]he fraudulent purpose exception exists 'where the *transaction is for the fraudulent purpose of escaping liability for the seller's obligations.'" *Oakridge Healthcare*, 181 N.E.3d at 196, *quoting Vernon*, 688 N.E.2d at 1175–76 (emphasis added); *Mamacita, Inc.*, 2011 WL 881654, at *5 ("The final exception allowing successor liability requires that the Plaintiff show that the sale was made for the fraudulent purpose of escaping the seller's obligations."). As pointed out above, Veroni did not purchase Baron nor did Baron enter an agreement to transfer substantially all its assets to Veroni. Indeed, Scale does not identify any "transaction" that was executed between Baron and Veroni.[5] Thus, the "fraudulent purpose" exception is facially inapplicable here.

---

[5] Furthermore, "[b]ecause there is little Illinois case law dealing with this exception, courts look to several factors, or 'badges of fraud,' enumerated under Illinois' Uniform Fraudulent Transfer Act ('IUFTA') to determine whether a plaintiff has stated a claim under this exception." *Mamacita, Inc.*, 2011 WL 881654, at *5; *Oakridge Health Care*, 181 N.E.3d at 196–201 (analyzing the IUFTA factors). Scale, however, has made no effort to explain how the IUFTA factors support its claim that the "fraudulent purpose" exception applies here, and the Court will not undertake this analysis on Scale's behalf.

For these reasons, Veroni's motion for summary judgment on Scale's successor liability claim is granted.

### B. Defendants are Entitled to Summary Judgment on Scale's "Scheme to Defraud" Claim.

Scale's "scheme to defraud" claim is based on its assertions that Gabal and Veroni repeatedly made promises of future payment in order to induce Scale to continue providing freight forwarding services. (Dckt. #140 at 12). Yet, according to Scale, no payments were made and when Scale would inquire about the promises, defendants replied Scale would receive payment once Baron had additional cash. (*Id.*). Defendants move for summary judgment on Scale's "scheme to defraud" claim for several reasons.

"Promissory fraud is a disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove or disprove." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992). Thus, under Illinois law, misrepresenting an intention to perform future conduct, even if made without the present intent to perform, does not constitute fraud. *See HPI Health Care Servs. v. Mt. Veron Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989). Instead, as the Seventh Circuit has recognized, promissory fraud is actionable only "if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy." *J.H. Desnick, M.D. v. American Broadcasting Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995).

A claim for promissory fraud "requires a showing that, *at the time the allegedly fraudulent statement was made,* it was an intentional misrepresentation. For promissory fraud claims, this requirement means that, when the promise was made, the promisor had no intent to fulfill it; if the promisor simply later changed his mind, an action for fraud will not lie." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) (emphasis in original).

Importantly, a plaintiff must prove fraud by clear and convincing evidence and the Court may take Scale's evidentiary burden into account when determining whether it has presented sufficient evidence to survive summary judgment. *Id.* at 854 (citing *Anderson*, 477 U.S. at 254 (confirming that a court "must view the evidence presented through the prism of the substantive evidentiary burden" in determining whether a genuine issue of fact has been raised sufficient to withstand summary judgment)). Thus, the burden on a plaintiff claiming promissory fraud is deliberately high. *See, e.g., Bower*, 978 F.2d at 1012.

Scale argues that defendants repeatedly promised to make good on past due payments, but had no intention to do so, in an effort to mislead and induce Scale to continue to provide services.

But, even setting aside Baron's payment for the second Costco shipment on August 8, 2018, the record reflects that, at best, Baron promised (but failed) to pay Scale one time between Baron's payment on July 31, 2018 of over $40,000 and Scale's cessation of shipments on August 9, 2018. Here, Gabal's single unfulfilled promise on August 2, 2018 that Baron "will continue to pay [Scale]" does not fit into a larger pattern of deception sufficient to maintain a scheme to defraud claim under Illinois law. *See Graff v. Leslie Hindman Auctioneers, Inc.*, No. 17 C 6748, 2019 WL 3766121, at *5 (N.D.Ill. Aug. 9, 2019). For example, in *Graff*, the plaintiff contended that defendant's misrepresentations were part of a scheme to defraud because at the time defendant promised that he would not sell a painting, he had already arranged for its sale. *Id.* The court found that defendant's promises on two occasions not to sell the painting, absent any other actions that reinforced the representations, fell short of the high bar required to suggest promissory fraud. *Id.*

Similarly, Scale has not put forth any argument explaining how Gabal's standalone

promise is "particularly egregious" as to constitute actionable promissory fraud under Illinois law. *See BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011) (specific, objective manifestations of fraudulent intent include evidence of "a pattern of fraudulent statements, or one particularly egregious fraudulent statement.") (cleaned up); *Nat'l Painting, Inc. v. PPG Architectural Finishes, Inc.*, No. 14 C 8054, 2015 WL 1593008, at *3–4 (N.D.Ill. Apr. 1, 2015) (concluding allegation that defendants' fraudulent representation that they would pay for all costs incurred by plaintiff, including labor and materials to repaint rooms where the paint did not touch up well, was not particularly egregious).

Scale nevertheless attempts to extend the timeline to capture Baron's promises to pay in late-August, September, and October 2018. These promises do not meet the high bar for fraud for two reasons. First, Scale admits that it "invoiced Baron after each shipment" and the last shipment of record is dated August 9, 2018. In order to succeed on its fraud claim, Scale must show reliance—i.e., that defendants' false representations induced Scale to continue to provide services. *See, e.g., Desnick*, 44 F.3d at 1354 (promissory fraud is actionable where it . . . *reasonably induces reliance*.") (emphasis added); *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 881–82 (7th Cir. 2005) (reasonable reliance required for promissory fraud claim). Here, there is no evidence that Scale provided any shipping services after August 9, 2018 in reliance on any alleged false representations. Thus, any statements thereafter cannot be part of the alleged scheme to defraud.

Moreover, even if all the false representations that Baron would pay its debt to Scale could be considered, it is well-settled that the mere repetition of the same alleged misrepresentation does not amount to a scheme to defraud. *See, e.g., Carcharadon, LLC v. Ascend Robotics, LLC*, No. 21 C 2890, 2022 WL 3908585, at *8 (N.D.Ill. Aug. 29, 2022)

(rejecting promissory fraud claims where plaintiffs alleged only that defendants repeatedly promised to finalize the IP License Agreement.); *Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, No. 17-cv-1879, 2019 WL 462481, at *6 (N.D.Ill. Feb. 6, 2019) ("Plaintiffs cannot establish a scheme to defraud merely by alleging that defendants made the same representation multiple times."); *Nat'l Painting, Inc.*, 2015 WL 1593008, at *4 (same).  Here too, Scale only puts forth evidence that Baron repeated its promise to pay between August 24, 2018 and November 2, 2018.

Even if Scale could show a string of promises on which it relied, its scheme to defraud claim would still fail because it has adduced no evidence that at the time defendants promised to pay, they never intended to fulfill that promise.  Baron entered into the Six Invoice Agreement on July 13, 2018.  Defendants highlight that Baron ultimately paid one of the invoices on July 31, 2018 and assert that Baron's "partial performance . . .  is dispositive proof that defendant had the present intent to perform at the time the promise was made and negates any inference to the contrary."  (Dckt. #133 at 10 (citing *Perlman v. Zell*, 938 F.Supp. 1327, 1339 (N.D.Ill. 1996)).  In *Perlman*, the court found a promise that investors would receive regular reports on the status of their investments was not actionable as fraud where defendants actually issued reports for several years, which "negate[d] any inference that the defendants did not intend to perform at the time they made the promise."  938 F.Supp. at 1339.

Similarly here, the Court agrees that the fact that Baron (1) submitted partial payment under the Six Invoice Agreement within two weeks of reaching that Agreement by paying over $40,000 on July 31, 2018 for one invoice covered by the Agreement and others, and (2) paid an additional $11,780 on August 8, 2018 for the second Costco invoice, weighs against any inference that Baron did not intend to perform at the time it made the promises to pay in July and

early August 2018. *Id.* Furthermore, Scale has failed to put forth any evidence that defendants "engaged in other acts of trickery compounding the initial misrepresentation[]" or that they "perpetrated this type of fraud as a regular practice, or on any grand scale" that would allow this Court to infer a scheme to defraud. *See, e.g.*, *Carcharadon, LLC*, 2023 WL 3320286, at *6.

In sum, Scale has failed to offer sufficient evidence that Baron's statements constitute a pattern of deception, that it reasonably relied on Baron's unfulfilled promises, that Baron engaged in more than repetition of the same alleged misrepresentation, that Baron never intended to pay at the time it made the misrepresentation, or that Baron engaged in other acts of trickery compounding the initial misrepresentation. These failures doom its scheme to defraud claim and summary judgment is warranted.

Finally, even if Scale put forth sufficient evidence to avoid summary judgment on its claim that Gabal (Baron's Executive Vice President) engaged in a scheme of defraud it, Scale has failed to provide any basis to attribute the scheme to *Veroni*. There is no evidence that Veroni made any promises that Baron would pay Baron's debts to Scale. To the contrary, all of the communications at issue were made by Baron representatives, in their capacity as Baron representatives, and to the extent applicable, from Baron email accounts, and Veroni was not obligated to pay Scale for the services it rendered to Baron. (DSOF Resp. ¶18). Furthermore, under Illinois law, corporations are separate and distinct legal entities from other corporations, including those with which they might be affiliated. *See, e.g., Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981); *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985). There is simply no basis in law to hold Veroni liable for Baron's purported promissory fraud unless Baron was the alter ego of Veroni in July and August 2018 when the material promises of payment were made, and Scale has failed to produce sufficient

19

evidence of this as explained below.

For these reasons, defendants Gabal and Veroni's motion for summary judgment on Scale's scheme to defraud claim is granted.

### C. Defendants are Entitled to Summary Judgement on Scale's Veil Piercing Theories Against Them.

Scale alleges that Baron is merely an alter ego, instrumentality and/or common enterprise for Gabal and Veroni. Defendants seek summary judgment based on their assertion that there is no evidence of any of the elements of alter ego/common enterprise or veil piercing.

A corporation "is separate and distinct as a legal entity from its shareholders, directors, and officers, and generally from other corporations with which it may be affiliated." *Main Bank of Chicago*, 427 N.E.2d at 101; *Laborers' Pension Fund v. Lay–Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) ("A corporation exists separately from its shareholders, officers, directors and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities."); *Van Dorn Co.*, 753 F.2d at 569–70. Nevertheless, courts may pierce a corporation's veil "when an 'individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business.'" *Lay-Com*, 580 F.3d at 610, *quoting Fortuna v. TLD Builders, Inc.*, 840 N.E.2d 767, 775-76 (Ill.App. 2005). Courts undertake the task of piercing the corporate veil reluctantly. *Auto. Fin. Corp. v. Joliet Motors, Inc.*, 761 F.Supp.2d 789, 792 (N.D.Ill. 2011). Accordingly, a plaintiff moving to pierce a corporate veil has a substantial burden. *Id*. Indeed, "[t]he party seeking to disregard the corporate entity must make a substantial showing that the corporation is really a dummy or sham for a dominating personality." *Roiser v. Cascade Mountain, Inc.*, 855 N.E.2d 243, 251 (Ill.App. 2006); *Buckley v. Abuzir*, 8 N.E.3d 1166, 1170 (Ill.App. 2014).

Illinois law permits veil piercing when two separate prongs are met: (1) "there is such a

unity of interest and ownership that the separate personalities of the corporation and the parties

who compose it no longer exist," and (2) "circumstances are such that adherence to the fiction of

a separate corporation would promote injustice or inequitable circumstances." *Buckley*, 8 N.E.3d

at 1170 (cleaned up). Courts consider the following factors when determining whether the

"unity of interest and ownership" prong of the piercing-the-corporate veil test is met: (1)

inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities;

(4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the

other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9)

diversion of assets from the corporation by or to a stockholder or other entity to the detriment of

creditors; (10) failure to maintain arm's-length relationships among related entities; and (11)

whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill.App. 2005). No single factor is

determinative. *Roiser*, 855 N.E.2d at 251.

> **1.    A number of relevant factors weigh against veil-piercing.**

Defendants have presented evidence that a number of relevant factors weigh against a

finding of veil piercing. In particular: (a) both Baron and Veroni issued stock;[6] (b) Veroni

maintained and observed corporate formalities and Scale presented no evidence that Baron failed

to do so; (c) Baron and Veroni did not have interlocking directorates; (d) Veroni did not

commingle its assets with Baron; (e) Baron and Veroni had separate bank accounts; (f) Gabal did

---

[6] The record does not reflect that Baron paid dividends to Kotas (its sole shareholder). However, under these circumstances, this factor likewise weighs in defendants' favor. Only Kotas stood to benefit if Baron paid dividends. It does not make sense to find that this evidence cuts against Veroni or Gabal where paying dividends would have harmed the cash flow of a corporation that was experiencing financial difficulties in the first place. *See Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F.Supp.2d 1029, 1042 (N.D.Ill. 2003).

not commingle his assets with either Baron or Veroni (DSOF Resp. ¶42); (g) Gabal never paid

his personal expenses using corporate funds from Baron or Veroni (DSOF Resp. ¶41);[7] and (h)

neither Gabal nor Veroni were shareholders of Baron. Moreover, Scale has presented no

evidence that Baron and Veroni commingled their operations by, for example, using a single

payroll system for both corporations' employees, informally transferring money between one

another, or by recording the property of one corporation on the books of another. *See, e.g.,*

*Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1389–90 (7th Cir. 1994); *Angell v. Santefort Fam.*

*Holdings LLC*, 179 N.E.3d 255, 261–62 (Ill.App. 2020).

> **2. The evidence that Scale focuses on is insufficient to raise a genuine issue of fact as to whether the corporate veil between Baron and Veroni and Gabal should be pierced.**

Scale largely ignores the factors cited above and instead focuses its veil-piercing

argument on its assertions that Baron was undercapitalized; Baron transferred funds to Gabal,

who, in turn, made a loan to Veroni; Gabal was aware that Baron was having financial

difficulties; and that Baron and Veroni shared common management and employees. This

evidence, however, is insufficient to raise a genuine issue of fact as to whether the corporate veil

between Baron and Veroni and Gabal should be pierced.

To begin, Scale argues that Baron was undercapitalized because it ceased operations,

commenced bankruptcy proceedings, failed to pay its invoices, and was described as having a

---

[7] *Cf. Joliet Motors, Inc.*, 761 F.Supp.2d at 793–94 (commingling where corporate funds were used to pay shareholders' mortgage obligations, television services, credit cards, groceries, and sporting event tickets); *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991) (commingling where "loans" flowed freely between Marchese's corporations, Marchese borrowed money from the corporation, and Marchese charged various personal expenses including $460 for a photograph with President Bush on the corporate credit card); *Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.*, 196 F.Supp.2d 731, 741 (N.D.Ill. 2002) (commingling where Park's car, and cell phone were paid through the company as corporate expenses, and Park used corporate funds to retain a law firm to advise him in applying for U.S. citizenship).

poor "cash situation" by Gabal. (Dckt. #140 at 14). However, courts will find a corporation to be undercapitalized only when it "has 'so little money that it could not and did not actually operate its nominal business on its own.'" *Firstar Bank, N.A.*, 249 F.Supp.2d at 1041, *quoting Browning–Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (same). Conversely, "[t]he fact that a corporation is losing money does not show that it is undercapitalized." *Judson Atkinson*, 529 F.3d at 379; *Firstar Bank*, 249 F.Supp.2d at 1042 ("[T]he evidence that the Dealership was losing money has no probative value in showing that the corporation was undercapitalized."). Perhaps most importantly, "to determine whether a corporation is adequately capitalized, one must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Fiumetto v. Garrett Enterprises, Inc.*, 749 N.E.2d 992, 1006 (Ill.App. 2001). Scale puts forth no evidence to determine Baron's capitalization based on this measure.

Scale also argues that Baron's funds were commingled with those of defendants because Baron transferred funds to Gabal (its Executive Vice President) in the amount of $15,500 in September 2018 and in the amount of $16,000 in December 2018. However, Gabal testified that these payments were for consulting services that he provided to Baron separate and apart from his role as Baron's Executive Vice President. (PSOF Resp. ¶21).[8] Scale also points to the fact that Gabal (who held significant stock in Veroni) made a $60,000 personal loan to Veroni in October 2018. However, Gabal's loan to *Veroni* does not show that either his or Veroni's funds were commingled with *Baron*.

---

[8] As defendants point out, Scale's assertion that Kotas testified that Gabal's only role with Baron was that of Executive Vice President is not supported by a citation to evidence. (PSOF Resp. ¶21).

Ultimately, with respect to Gabal, Scale has put forward evidence that he was an officer of Baron and Veroni and was aware of Baron's financial difficulties. This is not sufficient evidence for Scale's veil-piercing claims to survive. *See, e.g.*, *Judson Atkinson*, 529 F.3d at 381 ("Judson Atkinson's veil-piercing claims against Elsen and Hohberger appear to be baseless. The evidence supporting Judson Atkinson's veil-piercing claim against Hohberger seems to consist of nothing more than the fact that Hohberger was employed by LMC and was aware of the company's financial difficulties."). Nor is the fact that Baron and Veroni share common management and employees sufficient, in itself, "to justify disregarding the corporate form." *Id.*; *Walker v. Marca Const. Inc.*, No. 02 C 3285, 2003 WL 297529, at *4 (N.D.Ill. Feb. 11, 2003) ("Walker's support for veil piercing amounts to the observation that Marca receives free payroll assistance and phone support from an affiliated company with whom it shares building space. This is not enough for a jury to conclude that veil piercing is proper.")

In sum, Scale has failed to present sufficient evidence that bears on the veil piecing factors that would allow a reasonable jury to find that Veroni and Gabal had such a unity of interest and ownership with Baron such that the corporate veil between them should be pierced.

**3.    Scale has failed to present sufficient evidence to show that the adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances.**

Even if Scale had presented sufficient evidence to raise a genuine issue of fact as to whether Baron was a sham corporation, it has failed to provide evidence that would satisfy the second element of a successful veil-piercing claim under Illinois law, i.e., that the failure to pierce the corporate veil would sanction a fraud or injustice. *See Judson Atkinson*, 529 F.3d at 381 n.1. Scale asserts that it will suffer an injustice if defendants "are permitted to string along their creditors like this without consequence." (Dckt. #140 at 15). However, "[t]he injustice

must be more than the prospect of an unsatisfied judgment." *Id.*; *Roller Bearing Co. of A., Inc. v. MostonTR Pazarlama Dokum Ve Makina San., Ltd. Sti.*, No. 20 C 6924, 2021 WL 5882146, at *6 (N.D.Ill. Dec. 12, 2021) ("courts have repeatedly held that the prospect of an unsatisfied judgment is not sufficient to establish that piercing the corporate veil would prevent fraud or injustice.") (citing cases).

Instead, "[a] plaintiff must show that a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." *Judson Atkinson*, 529 F.3d at 381 n.1 (cleaned up). The first two of the above scenarios are clearly inapplicable here, and Baron's transfers to Gabal in September and December 2018 and Gabal's loan to Veroni in October 2018 *postdated* the last shipment that Scale made to Baron (which occurred in August 2018).[9] As such, Scale has also failed to satisfy the second element of the veil-piercing test, and defendants' motion for summary judgment on Scale's alter-ego/veil-piercing claim will be granted.

---

[9] The same is true for Baron's October, November, and December 2018 transfers to Kotas and Kotas' October 2018 loan to Veroni.

## CONCLUSION

For the above reasons, defendants' motion for summary judgment, (Dckt. #133), is granted. Summary judgment is granted on Scale's successor liability, scheme to defraud, and veil piercing claims with respect to defendants Veroni and Gabal.

**Date:  March 25, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**